# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RAYMOND POUNCEY, SR.,
  *Plaintiff,*

  v.                                          No. 3:14-cv-00475 (JAM)

TOWN OF HAMDEN, *et al.*,
  *Defendants.*

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Raymond Pouncey has worked for the Town of Hamden as a firefighter since 1997. He alleges that the Town of Hamden ("the Town") and various members of the Hamden Fire Department subjected him to on-the-job discrimination because of his religion.

He has brought this action by way of a 154-page amended complaint, claiming religious discrimination and the creation of a hostile work environment (Counts 1, 5, 9, 13, 17); retaliation (Counts 2, 6, 10, 14, 18); intentional infliction of emotional distress (Counts 3, 7, 11, 15, 19); and negligent infliction of emotional distress (Counts 4, 8, 12, 16, 20). The religious discrimination, hostile work environment, and retaliation claims are brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60, and against individual defendants under 42 U.S.C. § 1983. Defendants have moved for summary judgment on all claims. For the reasons set forth below, I will grant defendants' motion for summary judgment as to all claims except the hostile work environment claims against the Town under Title VII and CFEPA.

## BACKGROUND

Plaintiff has been a Jehovah's Witness since 1995 and has been employed by the Town of Hamden as a firefighter at the Hamden Fire Department (HFD) since September 2, 1997. According to plaintiff, he has been the victim of religion-based discrimination by the Town and

members of the HFD since Memorial Day of the year 2000. On May 29, 2000, the HFD was to participate in the Town's Memorial Day parade, but plaintiff objected to participating due to his religious beliefs. Because of his refusal, he was suspended without pay for one day by former Fire Chief Sullivan, who is not a defendant in this case.

Plaintiff contacted the ACLU, grieved his suspension, and prevailed: he had any letters removed from his personnel file and received two days of pay. But, according to plaintiff, his failure to march in the parade has plagued him ever since then in the eyes of others—particularly because Battalion Chief Samuel DeBurra told plaintiff in 2009 that plaintiff has been a "marked man" since the parade because of his religion. Doc. #67-4 at 29.

Plaintiff alleges multiple additional incidents and varieties of religion-based discrimination. These include, as discussed seriatim below, incidents involving cursing by co-workers in his presence, false accusations of misconduct, verbal and written warnings, transfers among stations, a suspension in 2012, a missed overtime opportunity, a reduction in duties, and failure to be promoted.

### Cursing

Plaintiff has clashed with many of his coworkers throughout the years, often because of their propensity to curse in front of him, which he finds objectionable because of his religion. He has unapologetically made his religious objection to cursing known throughout the fire department, Doc. #61-13 at 7, either by confronting the offender and soliciting an apology, or by writing an incident report and requesting that his managers counsel the entire department about the effect of cursing on plaintiff.

In a 2012 e-mail to plaintiff, Fire Chief David Berardesca noted several instances in which plaintiff had objected to cursing, and the Chief responded by training the platoon members

and otherwise counseling them to stop cursing in plaintiff's presence. Doc. #63-3. But because it is known that plaintiff is averse to cursing, plaintiff contends that every instance of profanity, even if not directed at him, constituted harassment on the basis of his religion.

### *False accusations of misconduct*

Plaintiff points to four allegedly false accusations of misconduct by his colleagues. The first incident occurred on September 25, 2012, when the HFD participated in a training session requiring the use of a 165-pound mannequin. Plaintiff and Lt. Pechmann (not a defendant) were haltingly moving the mannequin to place it in the truck, with Lt. Pechmann cursing that the mannequin was "fucking heavy." When they reached the truck, plaintiff dropped the mannequin, causing Lt. Pechmann to aggravate a back injury. Plaintiff states that he thought he heard Lt. Pechmann say "all set"—as in, go ahead and drop the mannequin—when in fact Lt. Pechmann had said "hold up a sec." *See* Doc. #62-4. But Lt. Pechmann and Firefighter Martin (also not a defendant) filed incident reports in which they alleged that plaintiff intentionally dropped the mannequin, saying to Lt. Pechmann "you dropped the F bomb, I dropped the bag." After review of the reports, Chief Berardesca concluded that plaintiff had intentionally dropped the bag and suspended plaintiff for two days. Doc. #61-4 at ¶¶ 38–41.

Plaintiff appealed his suspension to the Fire Commission, successfully overturned the suspension on January 30, 2013, and never served his two-day suspension. During the time plaintiff pursued his appeal of the suspension, he was eligible but passed over for one overtime shift on December 13, 2012, Doc. #67-4 at ¶ 24, though he made up that shift on February 3, 2013. Docs. #61-14 at 2; #61-4 at ¶ 46.[1]

---

[1] Plaintiff asserts that he would have been eligible for overtime pay had he not been skipped for overtime, but he later qualifies that statement by noting that he would not have met the hours requirement for overtime because he had been so stressed from the incident that he used his sick and vacation time. Docs. #67-2 at ¶ 29; #67-4 at ¶ 70. The parties diverge somewhat on the overtime issue. Plaintiff contends that he was prohibited from overtime

The second incident occurred on March 14, 2014, when plaintiff and defendant Lt. Kevin St. John responded to a medical call. Plaintiff and a colleague perceived Lt. St. John as being rude and unprofessional by yelling at plaintiff near a patient, while Lt. St. John believed that plaintiff shut a door in his face during that call. *See* Doc. #62-7. Although Battalion Chief DeBurra concluded that plaintiff's account of the event was more credible than Lt. St. John's, he "did not see the need for any further action," *id.* at 7, which plaintiff assails for failure to discipline Lt. St. John for filing a false report.

The last two false accusations occurred within a short time span, the first being on October 30, 2014, when plaintiff arrived for work two minutes late and was written up by Captain Couture. Doc. #62-8. Only three days later, plaintiff was again written up by Captain Couture, this time for leaving work before he had been properly relieved from duty. Doc. #62-9. On November 3, 2014, plaintiff was called in to speak with Battalion Chief Fitzmaurice (not a defendant) and Captain Couture about being late and leaving before he had been properly relieved. Doc. #67-4 at ¶ 51.

After plaintiff filed an internal harassment complaint, HR investigated and concluded that plaintiff had indeed been treated unfairly and that the rules surrounding a firefighter's reporting for and being relieved from duty "leave too much room for discretion." Doc. #67-5 at 21. The report concluded that management should provide "more clarity" to the "entire department of the standards required of all Firefighters" because it appeared that "[t]he unfortunate and inconsistent application of the policy regarding punctuality and proper relief did create a discrepancy" in plaintiff's case. *Id.* at 22. The HR officer also concluded that plaintiff's meeting

---

as a condition of his discipline for this incident, while defendants contend that plaintiff's missed overtime opportunity was inadvertent.

with Battalion Chief Fitzmaurice had not resulted in a verbal warning and was not considered as such by the administration, *id.* at 21, though plaintiff continues to assert that this was a discriminatory verbal warning.

### Written warning

On November 3, 2014, the day plaintiff was called in to meet with Battalion Chief Fitzmaurice and Captain Couture for a "verbal warning," plaintiff was also issued a written warning for physical intimidation of Captain Couture in violation of the Town's workplace violence policy. Doc. #67-5 at 13. The incident arose because Captain Couture admitted to plaintiff that he had been telling others about plaintiff's being late for and not being properly relieved from duty. During the exchange, Captain Couture began to raise his voice, standing approximately three feet away from plaintiff, who then put his coffee down and stood back in the same position. Captain Couture told plaintiff to back up, but plaintiff refused. Doc. #62-10. Plaintiff received a written warning on November 25, 2014 from Chief Berardesca, Doc. #67-5 at 13. He grieved the warning, and on June 22, 2016, the Town agreed to rescind the written warning. Doc. #67-5 at 15.

### Transfers

Plaintiff was transferred between fire stations at least ten times, nine of which occurred prior to early 2011. Doc. #61-2 at ¶ 5; #67-4 at 5 ¶ 17. Plaintiff alleges that one of the transfers in 2000 was a result of his being asked to raise a flag and refusing for religious purposes. Doc. #61-9 at 15–17.[2] A more recent transfer occurred on December 5, 2014, when plaintiff was notified that he would be transferred from Station 9 to Station 3, but that transfer was rescinded on

---

[2] In connection with or as a result of that flag-raising incident, plaintiff also contends that someone threw away some of his religious literature and then mockingly put flags in plaintiff's mailbox. Doc. #61-9 at 15–17.

December 11, 2014 (and plaintiff never worked at Station 3 on account of this failed transfer). Plaintiff was also transferred between platoons on January 15, 2015, but he remained at Station 9. Neither the December 2014 nor the January 2015 transfer is mentioned in the operative amended complaint.

Plaintiff's transfers between stations may have resulted in a reduction in duties because, upon arriving at each new station, he would lose any seniority he once had as to his rank in the prior station, which might result in his being unable to choose a preferred locker or bunk in the new station. Doc. #61-9 at 13–14. Additionally, being transferred to a new station might have altered plaintiff's responsibilities to the extent that a new station might have more than one apparatus, requiring potentially more responsibility, or a different apparatus, resulting in potentially less or different responsibility. *Id.* at 14. Defendants note that firefighters are routinely transferred and attach a sampling of those transfers in support of their summary judgment motion. Doc. #62-3.[3]

### *Reduction in duties and failure to be promoted*

Plaintiff alleges that Lt. St. John assigned him to the "rider" position instead of "driver" when responding to calls in October of 2013 and May of 2015. The parties dispute whether a firefighter's seniority plays a part in that firefighter's assignment as a "driver" or "rider" on any given call: defendants state that it does not affect the "driver" assignment because the senior officer directs apparatus assignments, but plaintiff asserts that it is "custom" for "the most senior guy or firefighter" to be offered the driving position. *Compare* Doc. #61-8 at ¶¶ 7, 8, *with* Doc. #67-4 at ¶¶ 71, 72. Although being assigned to the "rider" position on any given call does not

---

[3] Plaintiff responds that he believes those other transfers to be no less than "a pretext to mask or hide" plaintiff's transfers, Doc. #67-2 at ¶ 12, pointing to his recollection of a statement by another firefighter who said that his transfer was effectuated to mask plaintiff's transfer. Doc. #67-4 at ¶ 67.

affect the firefighter's pay or benefits, it may carry a negative connotation or affect opportunities for professional growth. *Compare* Docs. #67-1 at 4; #67-4 at ¶¶ 74, 88, *with* Doc. #61-4 at ¶¶ 20–22. Lt. St. John states that he assigned plaintiff to the rider position because plaintiff's strength allows him to remove and prepare the heavy-duty hose and ladder with greater ease than others, *id.* at ¶ 14, but plaintiff disagrees, stating that Battalion Chief Labanca (not a defendant) had hired plaintiff as a driver and that Lt. St. John's disregard of that assignment evidences a discriminatory motive.

Plaintiff also contends that he was passed over for promotion because of his religion. Doc. #64-4 at 29–31. To be eligible for promotion, a firefighter must take and pass a written lieutenant exam. If the firefighter passes the exam, he or she is placed on an eligibility list based on the exam score, which list will become certified. Once a list is certified, the Town can fill the lieutenant spot from among the three individuals with the highest scores on the lieutenant exam. The certified list expires every six months but may be recertified for up to two years. Of the three times plaintiff asserts his failure to be promoted, he did not take one exam, failed another, and was ranked sixth on the eligibility list dated July 22, 2009. *See* Doc. #63-1 at 5. The list was certified on August 3, 2009, and recertified until it was allowed to expire on February 3, 2011; during that almost two-year period, the five people before him on the list were promoted as late as December 6, 2010. Plaintiff contends that he was unable to properly prepare for the exam in 2009 because he was under stress from a false accusation of violence (not included in the acts alleged to be discriminatory, above) by Lt. Kobbe (not a defendant). He also contends that the Town intentionally allowed the list to expire because he would have been next to be promoted. Doc. #67-4 at ¶ 92.

Plaintiff has had other interpersonal clashes with his coworkers unrelated to his religious beliefs. For example, in 2008, plaintiff was an organizer for a charitable concert, soliciting donations from his union and other firefighters. After he had accepted donations, the concert fell through in 2009 for lack of ticket sales, but plaintiff did not refund some of his coworkers' donations because the funds had already been expended on concert promotion. His coworkers were upset, and when plaintiff asked Gary Merwede, the Deputy Fire Chief and Union president at the time (but not a defendant), why they were upset, Merwede responded that they wanted their "pound of flesh" from plaintiff. Doc. #61-5 at ¶¶ 7–16; Doc. #61-11 at 1–6. Plaintiff has had other clashes with Captain Couture, detailed in a 2014 incident report, including that plaintiff "blew the whistle" on Couture for using fire department equipment to help Couture's girlfriend move a large stone while the firefighters were on duty (thus missing a medical call), as well as that plaintiff had received help building his house from Couture, who had felt pressured to do so. Doc. #62-9 at 6, 8.

* * *

Plaintiff filed a succession of administrative charges and two federal court complaints that have now been consolidated in this action. He filed his first charge before the Connecticut Commission on Human Rights and Opportunities (CHRO) on February 28, 2013, for which a release of jurisdiction issued on January 15, 2014. Doc. #46, Exs. 1, 2. He then filed his first federal court complaint (against only the Town and Chief Berardesca) on April 9, 2014. Doc. #2.

Plaintiff filed his second CHRO charge on April 8, 2014, and received a release of jurisdiction for his second CHRO charge on October 30, 2014. Doc. #45, Exs. 3, 4. Plaintiff filed his second federal complaint on January 29, 2015.  Doc. #1 to No. 15-cv-122.

Plaintiff filed his third CHRO charge on February 6, 2015. Doc. #46, Ex. 5. He received

his release of jurisdiction for the third CHRO charge on September 30, 2015. Doc. #46, Ex. 6.

Plaintiff thereafter filed an amended complaint against the Town of Hamden, Chief Berardesca,

Battallion Chief DeBurra, Lt. St. John, and Captain Couture on November 13, 2015. Doc. #46.

Defendants now move for summary judgment on all claims.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well

established. Summary judgment may be granted only if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(a). My role at the summary judgment stage is to decide if there are

enough facts in dispute to warrant a trial. Of course, I must view the facts in the light most

favorable to the party who opposes the motion for summary judgment and then to decide if those

facts would be enough—if eventually proved at trial—to allow a jury to decide the case in favor

of the opposing party. If the facts do not rise to the level that would allow a reasonable jury to

rule in the opposing party's favor, then there is no point in allowing the lawsuit to proceed, and

the motion for summary judgment will be granted. *See generally Tolan v. Cotton*, 134 S. Ct.

1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d

Cir. 2017).

### *Procedural Bars to Consideration of Title VII and CFEPA Claims*

Plaintiff alleges three types of claims under Title VII and CFEPA against the Town of

Hamden as his employer: discrimination on the basis of his religion, retaliation on account of his

complaints about discrimination, and a hostile work environment because of his religion.[4] In order to evaluate whether there is a genuine fact issue as to any of these claims, I must first consider the Town's arguments that some of the evidence is procedurally barred by reason of the statute of limitations or because of plaintiff's failure to have included certain allegations and defendants in the administrative complaints that he filed before the CHRO.

A Title VII plaintiff "must satisfy two conditions before commencing suit in federal court." *McPherson v. New York City Dep't of Educ.*, 457 F. 3d 211, 213 (2d Cir. 2006). First, he must present his claim of discrimination by way of an administrative complaint to the U.S. Equal Employment Opportunity Commission (EEOC) or the CHRO and must do so within 300 days of the discriminatory act that forms the basis for a complaint. *See id.*; *Lewis v. Dep't of Corrections*, 355 F. Supp. 2d 607, 615–16 (D. Conn. 2005) (noting that "in light of a work-sharing agreement between the CHRO and the EEOC, a filing with the CHRO is properly deemed to be a filing with the EEOC"). Second, he must obtain from the EEOC or CHRO a right-to-sue letter and then file any federal court complaint within 90 days of receiving that letter. *McPherson*, 457 F. 3d, at 213–14; *see also Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F. 3d 35, 37 (2d Cir. 2011).

Similar time limitations govern state law CFEPA claims. Under CFEPA, a CHRO claim must be filed within 180 days after the alleged act of discrimination occurred. *See Montague v. Sodexco, Inc.*, 2017 WL 4476969, at *20 (D. Conn. 2017) (citing Conn. Gen. Stat. § 46a-82). A plaintiff in turn must file a court action within 90 days of receipt of a release of jurisdiction from the CHRO. *See Hannah v. Wal-Mart Stores, Inc.*, 969 F. Supp. 2d 229, 232 (D. Conn. 2013)

---

[4] Plaintiff does not challenge defendants' assertion that his Title VII and CFEPA claims may proceed only against the Town as his employer and not against any of the individual defendants. *See Sassaman v. Gamache*, 566 F. 3d 307, 315 (2d Cir. 2009); *Perodeau v. City of Hartford*, 259 Conn. 729, 744 (2002).

(citing Conn. Gen. Stat. § 46a-101(e)). These time limits are not jurisdictional but must be complied with absent a showing of exceptional reasons not alleged here such as consent, waiver, or equitable tolling. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *Williams v. CHRO*, 257 Conn. 258, 284-85 (2001).

When assessing the timeliness of a plaintiff's filing of a charge of discrimination I must consider each discrete discriminatory act (such as a termination or failure to promote) as having started a new clock for the filing of charges alleging the unlawfulness of that act. *See Elmenayer v. ABF Freight Sys., Inc.*, 318 F. 3d 130, 134 (2d Cir. 2003). But because a hostile-work-environment claim by its nature is ordinarily comprised of a series of separate acts that collectively constitute a single unlawful employment practice, such claims are timely if *any* act that is part of the hostile work environment falls within the limitations period, even if some of the acts relied on as a basis for the claim are independently untimely. *Ibid.*[5]

In plaintiff's first CHRO charge of February 28, 2013, plaintiff asserted numerous allegedly discriminatory acts that are time-barred because they occurred more than 300 days before his filing of the administrative complaint: his suspension in 2000 for failing to march in the Memorial Day parade; the 2000 "flag incident"; all transfers other than those of December 5, 2014, and January 15, 2015; and the "marked man" comment by DeBurra in 2009. Doc. #46 at 158–60. These acts may be considered solely as to plaintiff's hostile work environment claim

---

[5] Plaintiff does not explicitly raise the "continuing violation doctrine" as to his hostile work environment claims, but the language in *Elmenayer* suggests that a hostile work environment is "in effect, a continuing violation." *See Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, 134 (2d Cir. 2003). A question exists in my mind about whether the allegedly overt discriminatory acts of the 2000 parade, the discarding of his religious literature and the "flag" incident in 2000, and the 2009 "marked man" comment are sufficiently linked to any timely-asserted claims of discrimination, *Hardy v. Town of Greenwich*, 2008 WL 5117370, at *10–11 (D. Conn.) (no continuity of conduct in hostile work environment claim where temporal break between acts rendered alleged violation not "continuous" but rather "a series of isolated, unrelated acts"), but this appears to be a genuine issue of material fact for trial.

and otherwise as background evidence that is potentially relevant to whether any non-time-barred acts were discriminatory. *See Elmenayer*, 318 F.3d at 134.

Plaintiff's first federal court complaint was timely brought within 90 days of the CHRO release of jurisdiction as to plaintiff's first administrative charge. The federal court complaint therefore encompasses all timely pleaded acts that occurred within 300 days of the filing of the first CHRO complaint on February 28, 2013; these acts include an instance of profanity on September 9, 2012; the mannequin incident on September 25, 2012; the mannequin suspension of December 11, 2012; the missed overtime in December 13, 2012; and another instance of profanity on January 22, 2013. All prior acts of alleged discrimination are time-barred insofar as plaintiff seeks to assert them as independent grounds for relief that are not part of his hostile work environment claim.

Plaintiff filed a second CHRO charge on April 8, 2014, and this complaint could properly include any acts occurring on or after June 12, 2013 (Title VII 300 days) or October 10, 2013 (CFEPA 180 days). This would include the additional alleged discriminatory acts of being assigned a "rider" on October 13, 2013, and being accused of slamming the door in St. John's face on March 14, 2014. Doc. #46 at 178. But plaintiff did not file his federal court complaint within 90 days of his receipt of the CHRO's release of jurisdiction as to the second charge. Although plaintiff asserts that he "filed suit in district court on or before January 28, 2015," Doc. #67-1 at 10, and the complaint bears that date, the docket reflects that the complaint was not filed until January 29, 2015, which is 91 days after plaintiff's receipt of release of jurisdiction from the CHRO on October 30, 2014. The Clerk of Court confirms that the complaint was filed on January 29, 2015, and plaintiff's opposition to defendants' motion for summary judgment also

gave the January 29 date in at least one place. Doc. #67-1 at 6.[6] None of the allegations contained solely in this second CHRO charge, therefore, are properly before me.

In plaintiff's third charge of February 6, 2015—which may properly include all alleged discriminatory acts that occurred on or after April 12, 2014 (EEOC) or August 10, 2014 (CFEPA)—plaintiff asserted discriminatory acts from October 30, 2014 up until the date of the charge, which include the false accusations of being late and not being properly relieved from duty, being assigned a "rider," the physical altercation, the verbal warning, the transfers of December 5, 2014, and January 15, 2015, and car vandalism on November 25, 2014 (brake line) and December 24, 2014 (keying of his car). Doc. #46 at 188–90. Plaintiff filed an amended federal court complaint on November 13, 2015, to include these allegations, well within 90 days of release of jurisdiction of his third charge on September 30, 2015.

In short, I conclude as described above that plaintiff's Title VII and CFEPA claims are time-barred in part as to those alleged discriminatory acts that were not timely pursued before the CHRO or the timely subject of a subsequent federal court complaint. These time-barred acts may not form the basis for plaintiff's claims of discrimination or retaliation; they may, however, be considered as evidence with respect to plaintiff's hostile work environment claim and as background context with respect to plaintiff's non-time-barred claims of discrimination and retaliation.

Defendants further contend that several alleged acts of discrimination were not properly exhausted before the CHRO, because they were neither alleged in any CHRO complaint nor within the reasonable scope of any charge that was alleged before the CHRO. *See Fitzgerald v.*

---

[6] Even if this complaint had been filed on January 28, 2015, its CFEPA claims would not have been timely commenced, because under Connecticut law a CFEPA claim is "brought" when it has been served, *see Hannah v. Wal-Mart Stores, Inc.*, 969 F. Supp. 2d 229, 232 (D. Conn. 2013), and this complaint was not served until February 21, 2015, well outside of the required 90-day period.

*Henderson*, 251 F. 3d 345, 359–60 (2d Cir. 2001) (failure to allege a given claim in administrative proceedings precludes adjudication of that claim unless reasonably related to those claims that a plaintiff did assert). Those non-exhausted claims include plaintiff's claim of failure to promote, all of his transfers prior to 2014, the alleged vandalism of his car in 2009, 2010, and 2013, and an incident involving hose pressure.

Plaintiff does not argue that he included any of these incidents in his CHRO charges, instead only pointing out that the December 2014 and January 2015 transfers were included in the February 2015 CHRO complaint. But those transfers were not pled in the operative amended complaint. Nor were they "reasonably related" to the 2014 and 2015 transfers. Though they were all the same kind of event, they were each discrete acts and not subject to a continuing violation theory. The earlier transfers did not "fall within the scope of the . . . investigation which can reasonably be expected to grow out of the charge" concerning the later transfers. *Fitzgerald*, 251 F.3d at 359–60. None of these incidents, therefore, are properly grounds for plaintiff's causes of action.

In short, many of plaintiff's allegations are procedurally barred by reason of plaintiff's failure to have timely and properly exhausted the administrative complaint process or to have timely filed his federal court complaint. In light of the restricted scope of evidence that is not procedurally barred, I will now turn to evaluating each of plaintiff's Title VII and CFEPA claims.

### *Discrimination*

As to those alleged acts of religion-based discrimination that were properly exhausted and are not time-barred, the Town contends that no genuine fact issue remains to warrant a trial. I agree. To establish a claim for religious discrimination, plaintiff has the initial burden to

establish that he (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) the circumstances of the adverse employment decision give rise to an inference of discrimination. *See Mandell v. City of Suffolk*, 316 F. 3d 368, 377 (2d Cir. 2003). Once plaintiff has established a *prima facie* case of discrimination, a presumption arises that his defendant employer unlawfully discriminated against him. To rebut this presumption, the employer must come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions toward plaintiff. *Id.* at 379–80. If the employer does that, the burden shifts back to plaintiff to prove that the real reason for the adverse employment decision was discrimination. *Id.* at 380–81.

The Town contends that there was no adverse action or that any such action did not occur under circumstances giving rise to an inference of discrimination. An adverse action is a "materially adverse change" in the terms and conditions of employment. *See Sanders v. New York City Human Res. Admin.*, 361 F. 3d 749, 755 (2d Cir. 2004). "To be adverse, the change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Ibid* (citations omitted). A disciplinary action may not be an adverse employment action if it has no effect or ramifications; along those lines, "[r]eprimands, threats of reprimands, and excessive scrutiny of an employee . . . do not constitute materially adverse employment actions." *Oliphant v. Connecticut Dep't of Transp.*, 2006 WL 3020890, at *6 (D. Conn.).

As noted above, many of the adverse actions alleged by plaintiff are not properly before me for lack of exhaustion or timely filing. Properly before me are the false accusations of

misconduct, the 2014 written warning for the physical altercation with Captain Couture, being assigned as a "rider," and the missed overtime shift. Of the false accusations of misconduct— namely, the mannequin incident, the door-slam incident, and the lateness/failure-to-be-relieved incidents—only the mannequin incident resulted in any disciplinary action. At least for purposes of plaintiff's religious discrimination claims, then, the door-slam incident and the lateness/failure-to-be-relieved incidents are not adverse employment actions.

As to the mannequin incident, defendants argue that it does not constitute an adverse employment action because plaintiff never served his suspension. *See Whittaker v. Northern Illinois Univ.*, 424 F. 3d 640, 647 (7th Cir. 2005) ("Simply put, a suspension without pay that is never served does not constitute an adverse employment action."). I agree. The *Whittaker* case concerned a woman who never served her suspension because she "voluntarily left her job . . . taking a leave of absence from which she would never return" before her suspension could take effect. Here, plaintiff only avoided serving his suspension because he appealed his suspension to the Fire Commission, which overturned it. Although being forced to go through this appeal process was undoubtedly an "inconvenience," this is not enough to constitute an adverse employment action. *See Sanders*, 361 F.3d at 755.

In any event, even if the mannequin incident resulted in an adverse employment action, I would also conclude that plaintiff could not establish that this action was motivated by religious discrimination. Plaintiff's evidence of discrimination is the "marked man" comment made three years prior to the incident by Lt. DeBurra, that it is "suspect" that Lt. Pechmann "injected" himself into carrying the mannequin, and a statement in plaintiff's affidavit that Berardesca failed to properly investigate the false accusation and "made a calculated wrong decision" in

choosing not to believe plaintiff's account of that incident. Doc. #61-1 at 30–31; Doc. #67-2 at ¶23; Doc. #67-4 at ¶24.

This is not sufficient evidence to give rise to an inference of discrimination, let alone to show that defendants' legitimate, non-discriminatory reasons for the action were mere pretext for religious discrimination. Plaintiff can point to no evidence that any of the actors associated with the incident—Lt. Pechmann and Firefighter Martin (neither one a defendant), or Chief Berardesca—harbored animus against plaintiff for his religious beliefs or treated plaintiff differently with respect to this incident because of his religion. To the contrary, Chief Berardesca appears to have worked with plaintiff on numerous occasions to address slights plaintiff perceived to be related to his religion. No reasonable factfinder could conclude that Chief Berardesca's stated reasons for suspending plaintiff—the largely consistent incident reports by Lt. Pechmann and Firefighter Martin—were a mere pretext for the Chief's real decision to suspend plaintiff for his religious beliefs.

As for the written warning for the physical altercation with Captain Couture, plaintiff received no discipline for the incident. Doc. #67-5 at 13 ("This letter serves as notification of a written warning to substantially modify your actions . . . . This written warning requires immediate and sustained improvement in your actions and behavior while at work. Any future incident of this nature will result in further discipline up to and including suspension or termination of employment . . . ."). Even having received this written warning, which did not impose any change in his terms of employment, plaintiff grieved the warning and eventually prevailed, albeit on the eve of the parties' filing of dispositive motions in this case. I therefore conclude that plaintiff has not met his burden of showing that this warning materially changed the terms and conditions of his employment.

As for being assigned to the rider position, there is no evidence that this intermittent assignment—imposed only by Lt. St. John—had any "actual material, as opposed to . . . speculative, impact" on plaintiff's job. *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 213–14 (E.D.N.Y. 2014). Plaintiff admits that differences between "the duties [of] the driver and rider do[ ] not impact the actual pay grade or check that the firefighter receives," but he nevertheless insists that being assigned rider is less prestigious and "carries a negative connotation." Doc. #67-1 at 4. He claims only in vague terms that "[a]ssigning one to drive position gives one opportunity to develop more skills and better opportunity for growth." Doc. #67-4 at ¶ 74. But this statement alone does not create a genuine issue as to the material adversity of being assigned as a rider. *See Carter v. New Venture Gear, Inc.*, 310 Fed. Appx. 454, 457 (2d Cir. 2009) (upholding grant of summary judgment where plaintiff did not meet burden of raising a genuine issue of material fact that her assignment to an admittedly equally paying and comparable job was "materially less prestigious, materially less suited to [her] skills and expertise, or materially less conducive to career advancement"); *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) ("plaintiff must show that the transfer created a 'materially significant disadvantage'"). On this sparse record, I cannot conclude that plaintiff has met his burden to establish a fact issue that being assigned as a "rider" rather than a "driver" on occasion was a materially adverse employment action.

Finally, I conclude that plaintiff cannot meet his burden with regard to his missed overtime opportunity. Because this resulted in lost pay, it could be a materially adverse employment action. But—for the same reasons as discussed above with respect to the mannequin incident—plaintiff has not advanced any evidence that this missed overtime opportunity arose under circumstances giving rise to an inference of religious discrimination or evidence of pretext.

I conclude that no genuine issue of fact remains to sustain plaintiff's claims under Title VII and CFEPA that he was subject to religion-based discrimination. Accordingly, I will grant summary judgment for the Town as to plaintiff's claims of religious discrimination under Title VII and CFEPA.

### Retaliation

The Town contends that plaintiff cannot prevail on his claim that he was retaliated against for opposing religiously discriminatory practices. For this claim, a plaintiff must present evidence sufficient to permit a rational trier of fact to find (1) that he engaged in protected participation or opposition under Title VII; (2) that the employer was aware of this activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action. *See Zann Kwan v. Andalex Group LLC*, 737 F. 3d 834, 844 (2d Cir. 2013). If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. *Ibid*. Ultimately, a Title VII plaintiff must prove that retaliation was the but-for cause of the adverse action, in other words, that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Ibid*; *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517, 2533 (2013).[7]

Defendants argue that plaintiff did not engage in protected opposition because plaintiff's belief that defendants' actions violated Title VII or CFEPA was not a reasonable one. *See Kelly*

---

[7] The Connecticut courts have yet to decide whether the rule of *Nassar* also applies to claims under CFEPA. *See Moody v. Aircastle Advisor, LLC*, 2016 WL 1257805, at *13 (D. Conn. 2016). As in *Moody*, the distinction is immaterial, because my conclusions would be the same under either the but-for causation standard or the "motivating factor" standard.

*v. Howard I. Shapiro & Assocs. Consulting Engineers*, 716 F. 3d 10, 14–15 (2d Cir. 2013). I do not agree. Whether a belief is reasonable must be assessed in light of the totality of the circumstances. *Id.* The totality of the circumstances here includes conduct such as the parade suspension and "marked man" comment that could reasonably lead plaintiff to believe that he had been discriminated against on the basis of his religion, even though those events are now time-barred as independent causes of action under Title VII and CFEPA.

The Town also contends that plaintiff's complaints to management about harassment would not have put it on notice that plaintiff complained of conduct that was prohibited by Title VII or CFEPA. I again disagree. Since 2000, plaintiff was clear about the strength of his religious beliefs and was persistent in opposing any practice that appeared to impinge upon those beliefs, by filing charges, by writing letters to the mayor, Doc. #67-5 at 18 ("I have been bullied, targeted, intimidated, subjected to hostility and unfair treatment for years because of my faith."), and by repeatedly requesting that management counsel plaintiff's colleagues not to curse in front of him because of his beliefs. Although plaintiff did cite to "professionalism" at times when discussing his issues with profanity, he also cited his religious concerns.

The Town next contends that plaintiff has not set forth an "adverse action" sufficient to support a retaliation claim. An "adverse action" for purposes of a retaliation claim is an action that "a reasonable employee" would have found to be "materially adverse," meaning that it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). "In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of

retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

Plaintiff generally points to the same actions as he did for his discrimination claim as discussed above, but he adds claims for profanity and the "flag incident."[8] Doc. #67-1 at 18, 22. Because plaintiff need not show in the retaliation context that these actions affected the terms and conditions of his employment, and because plaintiff's timely claims are numerous and constant, I conclude that he met his burden to show a genuine fact issue as to whether a reasonable worker might have been dissuaded from pursuing a charge of religious discrimination because of the acts alleged, in the aggregate.

As to causation, "a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan*, 737 F. 3d, at 845. At least at the *prima facie* stage, a plaintiff can indirectly show a "causal connection" by temporal proximity between the protected opposition and the adverse action. *Ibid* ("the but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage . . . indirectly through temporal proximity"). Here, plaintiff alleges temporal proximity between his February 2013 CHRO charge and his October 13, 2013 "rider" assignment, his May 2015 "rider" assignment, as well as temporal proximity between his complaint of Lt. Pechmann's profanity during the mannequin incident and the same-day "false" incident reports and suspension. This is sufficiently close in time to meet plaintiff's *prima facie* burden.

The Town in turn has proffered legitimate, non-discriminatory reasons for these actions, *see* Doc. #61-1 at 34–35, 45–46, so the burden shifts back to plaintiff to show pretext. I conclude

---

[8] The flag-raising incident is time-barred because it occurred in or around 2000. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 105 ("discrete acts" timeliness requirement applies to acts of retaliation).

that plaintiff is unable to meet this burden. In his opposition to summary judgment, plaintiff points only to temporal proximity as his evidence of pretext, stating that "every time that the Plaintiff complained to his supervisors of disparate treatment, an incident would closely follow where he was humiliated, discriminated against or disciplined unnecessarily." Doc. #67-1 at 23. Such a dramatic pattern of retaliation might well serve as evidence of pretext, but the actual evidence here is not so striking. The rider assignments, which plaintiff assigns as retaliation for his February 2013 CHRO complaint, did not occur until eight months after the filing of that complaint. Although the allegedly false allegations concerning the mannequin incident did occur the same day as plaintiff's complaints regarding that incident, it is only to be expected that both sides of such a dispute would file their reports immediately after the incident.

Any other evidence in the record that might tend to suggest that the Town's stated reasons were pretextual, such as the "marked man" comment, do not support a reasonable conclusion that the real motive was retaliation for plaintiff's religious discrimination complaints. I therefore conclude that no reasonable jury could conclude that any of the alleged retaliatory actions was in fact intended as retaliation for plaintiff's discrimination complaints.

### Hostile Work Environment

Plaintiff's hostile work environment claim requires him to show that "the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment" because of plaintiff's religion. *See Patane v. Clark*, 508 F. 3d 106, 113 (2d Cir. 2007) (*per curiam*).

The complained-of conduct must be either "a single incident [that] was extraordinarily severe, or . . . a series of incidents [that] were sufficiently continuous and concerted to have

altered the conditions of [a plaintiff's] working environment." *Alfano v. Costello*, 294 F. 3d 365, 374 (2d Cir. 2002). "There is no 'mathematically precise test,' however, for deciding whether an incident or series of incidents is sufficiently severe or pervasive to alter the conditions of a plaintiff's working environment. Instead, courts must assess the totality of the circumstances, considering elements such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect of identified incidents on the employee's psychological well-being is also relevant, though not determinative." *Raspardo v. Carlone*, 770 F. 3d 97, 114 (2d Cir. 2014) (citations omitted).

Although the Town correctly notes that only several of the incidents were explicitly linked to plaintiff's religion, I conclude on the basis of the entire range of incidents that a genuine fact issue remains in support of plaintiff's hostile work environment claim. *See Elmenayer*, 318 F.3d at 134. In my view, a factfinder could conclude that a reasonable person might find nearly 20 years of confrontational incidents, transfers, and disciplinary actions, with several comments directed at one's religion, to be sufficiently pervasive and severe as to alter one's work environment. This is not to say that plaintiff's claims are particularly strong or persuasive, only that they are enough to allow for consideration by a jury at trial.

The Town argues that the actions of the individual defendants cannot be imputed to the Town because those supervisors were not supervisors with respect to the hostile work environment claim and because only Chief Berardesca could impose a tangible employment action. I disagree. Each of the individual defendants was empowered to take tangible employment actions against plaintiff, *see Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013), even if the Chief could ultimately agree or disagree with the action taken.

The Town next asserts the *Faragher/Ellerth* affirmative defense, contending that it acted reasonably in attempting to prevent and promptly correct harassing behavior and that plaintiff unreasonably failed to take advantage of the employer's preventative or corrective measures. *See Ferraro v. Kellwood Co.*, 440 F. 3d 96, 101 (2d Cir. 2006). While I agree that plaintiff often failed to take advantage of the employer's measures to address harassment, and at times did not avoid harm, I conclude that a genuine issue for trial exists as to whether the Town reasonably prevented and corrected the harassment about which plaintiff repeatedly complained. Although plaintiff may have great difficulty at trial prevailing on his claim that he was the victim of a hostile work environment, much less a hostile work environment that was specifically due to his religion (as distinct from other work demands or interpersonal conflicts), there is enough evidence here for plaintiff's hostile work environment claim to proceed to a jury.

### Section 1983 claims

Although I conclude that there is a genuine fact issue for trial as to plaintiff's hostile work environment claim against the Town, I will grant summary judgment as to plaintiff's § 1983 claims against the individual defendants for a violation of the Equal Protection Clause. As an initial matter, the statute of limitations for plaintiff's § 1983 claims is three years, such that any acts prior to three years before the filing of plaintiff's first court complaint on April 9, 2014, are time-barred from consideration with respect to plaintiff's § 1983 claims. *See Walker v. Jastremski*, 430 F. 3d 560, 562 (2d Cir. 2005).

Moreover, when considering § 1983 discrimination claims against individual defendants, I must consider each defendant individually, and the misconduct of third parties may not be automatically attributed to an individual defendant. *See Raspardo*, 770 F. 3d at 115 ("when a plaintiff alleges that multiple individual defendants have engaged in uncoordinated and

unplanned acts of harassment, each defendant is only liable under § 1983 when his own actions are independently sufficient to create a hostile work environment.").

The main actions attributable to any individual defendants—the "marked man" comment by Chief DeBurra (which occurred more than three years before the filing of the complaint), the altercation with Captain Couture, and the "rider" assignments by Lt. St. John—taken independently, fall well short standing alone of creating an environment that is so severe and pervasive so as to alter the terms and conditions of plaintiff's employment. I also conclude that each of the individual defendants is entitled to qualified immunity from any § 1983 claim for the reasons stated in defendants' motion. *Id.* at 115–16; *see also Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006).[9]

I will also grant summary judgment as to the Town on the § 1983 claim. A municipality is not liable for the constitutional violations of its employees unless those violations resulted from a municipal policy, practice, or custom. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–94 (1978). The Supreme Court made clear in *Monell* that municipalities are not vicariously liable in *respondeat superior* for the unconstitutional misconduct of their officials and employees. *Ibid.*; *see also Adams v. City of New Haven*, 2015 WL 1566177 (D. Conn. 2015) (dismissing *Monell* claims against municipality for lack of facts plausibly showing existence of any municipal policy, practice, or custom that caused plaintiff's harm). Plaintiff here has not shown a genuine fact issue to suggest that the adverse conduct that occurred within three years of his filing of his first federal court complaint was the product of any Town policy, practice, or custom.

---

[9] To the extent that plaintiff alleges a violation of 42 U.S.C. § 1981, this claim fails for the same reasons and because § 1981 does not prohibit discrimination on the basis of religion. *See Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998).

### *Intentional/Negligent Infliction of Emotional Distress*

Lastly, defendants argue that plaintiff's claims for intentional and negligent infliction of emotional distress fail as a matter of law. I agree in light of the very demanding standards that apply to such claims. In order to prevail on a claim of intentional infliction of emotional distress, a plaintiff must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 301 Conn. 575, 586 (2011). Here it is clear that none of the defendants' conduct, taken separately or as a whole, was "extreme or outrageous," for the reasons stated in defendants' papers. *See* Doc. #61-1 at 61–64.

Defendants further argue that plaintiff cannot, as a matter of law, state a claim for negligent infliction of emotional distress while still employed by the Town. *See Perodeau v. City of Hartford*, 259 Conn. 729, 762–63 (2002) ("an individual municipal employee may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment."); *Brunson v. Bayer Corp.*, 237 F. Supp. 2d 192, 208 (D. Conn. 2002). Plaintiff has not argued otherwise, and I agree. Accordingly, I will grant summary judgment for defendants on the intentional and negligent infliction of emotional distress claims.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. #61) is GRANTED in large part and DENIED in part. The motion is DENIED solely as to plaintiff's

hostile work environment claim against the Town of Hamden under Title VII and CFEPA, and is otherwise GRANTED as to all of plaintiff's other claims.

It is so ordered.

Dated at New Haven this 27th day of November  2017.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge